IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-03166-RMR-KAS

KAYLA RAINEY,
SARA WAKELY,
RAISA ALMADA,
LEIGH ANNE LAPP,
KATHLEEN LEIVIAN,
KATHERINE POWELL,
DEBORAH LASCHINGER,
DARLENE KREDER,
ANNE OLSON,[1]
BRIDGETTE PIERCE,[2] and
ALEXANDRA LASCHINGER,

      Plaintiffs,

v.

WESTMINSTER PUBLIC SCHOOLS, and
KIRCHERS LEDAY, in his personal and official capacity as Chief of Staff, Human
Resources Department,

      Defendants.

_____

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

**ENTERED BY MAGISTRATE JUDGE KATHRYN A. STARNELLA**

      This matter is before the Court on Plaintiffs' **Motion for Leave to Amend**

**Complaint** [#37] (the "Motion"). Defendants filed a Response [#39] in opposition to the

---

[1] Defendant Anne Olson was referred to as Anne Rivard in the original Complaint [#1], *see* [#1] at 1, 12 ¶¶ 81-85, but her surname is changed in the Proposed Amended Complaint [#37-1], *see* [#37-1] at 1, 24-26 ¶¶ 104-11, to reflect the fact she has since married and changed her legal name. *Motion* [#37] at 3.

[2] Defendant Bridgette Pierce was referred to as Bridgette McGurn in the original Complaint [#1], *see* [#1] at 1, 12 ¶¶ 86-90, but her surname is changed in the Proposed Amended Complaint [#37-1], *see* [#37-1] at 1, 26-27 ¶¶ 112-18, to reflect the fact she has since married and changed her legal name. *Motion* [#37] at 3.

Motion [#37], and Plaintiffs filed a Reply [#40]. The Motion [#37] has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D.C.COLO.LCivR 72.1(c)(3). *See* [#38]. The Court has reviewed the briefs, the entire case file, and the applicable law. For the reasons set forth below, the Court **RECOMMENDS** that the Motion [#37] be **GRANTED in part and DENIED in part**.[3]

### I. Background

Plaintiffs initiated this lawsuit on December 7, 2022. *See Compl.* [#1]. In response to the District Judge's Order [#36] adopting in relevant part a Recommendation [#28] to grant Defendants' Motion to Dismiss [#24] the Complaint [#1], Plaintiffs filed the present Motion [#37], along with a Proposed Amended Complaint [#37-1], on October 26, 2023.

Plaintiffs were employed by Defendant Westminster Public Schools ("WPS") for the 2021-2022 school year. *Proposed Am. Compl.* [#37-1] at 2. In response to the COVID-19 pandemic, Defendant WPS implemented a vaccine requirement for employees, which required all teachers and staff to either receive a COVID-19 vaccine or obtain an exemption from Defendant WPS by October 15, 2021. *Id.* at 3. Plaintiffs aver that they have sincerely held religious beliefs which prevent them from receiving a COVID-19 vaccine. *Id.* Plaintiffs assert that they informed Defendants of these beliefs and sought religious exemptions from the vaccine mandate. *Id.* Plaintiffs claim that Defendants purported to grant the exemptions but in practice offered no reasonable accommodations to Plaintiffs. *Id.* at 3-4.

---

[3] "Motions to amend generally are considered non-dispositive," but where a Magistrate Judge determines that a request to amend the pleadings should be denied, that determination is deemed dispositive and therefore must be made by recommendation. *Farbaugh v. Isle, Inc.*, No. 20-cv-03644-CNS-STV, 2024 WL 1858500, at *3 (D. Colo. Apr. 29, 2024).

Plaintiffs assert that they proposed reasonable accommodations in meetings with Defendant Kirchers Leday ("Leday"), Chief of Staff of the Human Resources Department at WPS, and other members of the Human Resources Department, including wearing masks and undergoing regular temperature checks. *Id.* at 4-5. Additionally, Plaintiffs assert that Defendant WPS could have accommodated them by requiring them to take unpaid leave in the event that they needed to quarantine due to COVID-19 exposure. *Id.* at 5. Following these discussions, Defendant Leday communicated to Plaintiffs that Defendant WPS was unable to provide any accommodations for Plaintiffs' requests for religious exemption, as they would result in undue hardship to Defendant WPS. *Id.* at 4.

Plaintiffs aver that, in response to their request for reasonable accommodations, they were placed on indefinite unpaid leave effective October 18, 2021. *Id.* Plaintiffs allege that the indefinite unpaid leave constituted such a significant change in benefits that it was practically the equivalent of termination. *Id.* at 4-5. Additionally, Defendant Leday instructed Plaintiffs that they were not to communicate with any WPS students or staff without his prior approval as Chief of Staff. *Id.* at 6. Furthermore, Plaintiffs assert that they were informed that a refusal to comply with this directive could result in termination of employment. *Id.* Plaintiffs were informed of these restrictions via letter, which stated as follows:

> During your leave, you are directed not to have contact with any Westminster Public Schools students or staff in person or through electronic communications, or be present on any Westminster Public Schools premises without the permission of the Chief of Staff. Failure to adhere to this directive will lead to disciplinary actions up to an[d] including termination of employment.

*Id.* at 6.

Plaintiffs assert that this "no-contact directive" applies to all WPS employees placed on unpaid leave and "is the official policy of the Defendant." *Id.* Plaintiffs aver that Defendant Leday is the final policymaker with respect to the handling of accommodation requests or exemptions from the vaccine mandate. *Id.* Alternatively, Plaintiffs aver that WPS delegated final decision-making authority to Defendant Leday regarding Plaintiffs' requests, including issuing letters outlining the conditions of their unpaid leave. *Id.* at 6-7. Plaintiffs allege that Defendant Leday spoke for Defendant WPS when he directed Plaintiffs to have no contact or communication with any WPS staff or students. *Id.* at 7. Plaintiffs assert that their speech was chilled because of this no-contact policy. *Id.* Further, Plaintiffs allege that this directive resulted in a prohibition on discussions with WPS staff on matters of public concern and caused Plaintiffs distress due to the threat of disciplinary action. *Id.*

As a result of these allegations, Plaintiffs filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Colorado Civil Rights Division ("CCRD"). *Id.* at 5-6. Plaintiffs subsequently received right-to-sue letters and then filed this lawsuit. *Id.* at 6.

Plaintiffs first bring a 42 U.S.C. § 1983 claim against Defendant WPS and Defendant Leday in his individual and official capacities alleging violations of their First Amendment rights. *Id.* at 30. Plaintiffs aver that the no-contact policy constituted an unconstitutional prior restraint on their speech. *Id.* at 31. Furthermore, Plaintiffs assert that Defendant Leday violated clearly established law and thus is not entitled to qualified immunity. *Id.*

Second, Plaintiffs assert a violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq., against Defendant WPS due to its failure to accommodate religious beliefs. *Id.* Plaintiffs assert that they were qualified for their positions with Defendant WPS, performed their job duties satisfactorily, and were denied reasonable accommodations for their religious beliefs. *Id.* at 31-32. Plaintiffs aver that indefinite unpaid leave was an adverse employment action that, to Plaintiffs, was indistinguishable from termination. *Id.* at 32. Furthermore, Plaintiffs assert that Defendant WPS could have reasonably accommodated them without undue hardship. *Id.*

Third, Plaintiffs Kayla Rainey ("Rainey"), Sara Wakely ("Wakely"), Raisa Almada ("Almada"), Leigh Anne Lapp ("Lapp"), Kathleen Leivian ("Leivian"),[4] Katherine Powell ("Powell"), Deborah Laschinger ("D. Laschinger"), Anne Olson ("Olson"), and Alexandria Laschinger ("A. Laschinger") assert another violation of Title VII against Defendant WPS based on a constructive discharge theory. *Id.* at 33. These Plaintiffs aver that, due to being placed on indefinite unpaid leave, they were put in a position in which they had no choice but to resign.[5] *Id.* at 34.

Fourth, Plaintiffs assert a violation of the Colorado Anti-Discrimination Act ("CADA"), Colo. Rev. Stat. § 24-34-401, et seq., against Defendant WPS. *Id.* at 34. Plaintiffs aver that Defendant WPS failed to reasonably accommodate their sincerely held religious beliefs by placing them on indefinite unpaid leave, which resulted in economic

---

[4] Plaintiff Leivian's surname was misspelled as "Leivan" in this third claim for relief. *Compare Proposed Am. Compl.* [#37-1] at 1, *with id.* at 33.

[5] In their initial Complaint [#1], Plaintiffs asserted the two Title VII claims under a single heading. *Compl.* [#1] at 15.

damages and emotional distress to Plaintiffs and constituted a constructive discharge. *Id.* at 35.

In her Order [#36] granting Defendants' Motion to Dismiss [#24] the original Complaint [#1], the District Judge dismissed the First Amendment claim because Plaintiffs failed to indicate which topics of public concern they refrained from speaking about due to the no-contact policy. Order [#36] at 8. The District Judge dismissed the Title VII claim for two reasons. *Id.* at 3-6. First, Plaintiffs did not allege non-conclusory facts about their religious beliefs or the purported conflict between those beliefs and Defendant WPS's vaccination requirement. *Id.* at 6. Second, Plaintiffs failed to adequately support their claim that their placement on unpaid leave essentially constituted termination. *Id.* at 4. The District Judge also dismissed the state CADA claim because exercising supplemental subject matter jurisdiction would be inappropriate following the dismissal of all federal claims.[6] *Id.* at 9.

With the permission of the District Judge, Plaintiffs timely filed the present Motion [#37] to attempt to cure the deficiencies of their original Complaint [#1]. *Order* [#36] at 10. Defendants argue that the Motion [#37] should be denied because the proposed amendments are futile. *Response* [#40] at 2-3.

## II. Standard of Review

Pursuant to Fed. R. Civ. P. 15(a)(2), the Court should grant leave to amend a complaint "freely . . . when justice so requires." That mandate "is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962). However, a court may deny leave to amend "if the

---

[6] Additionally, although not specifically referenced by the District Judge in her Order [#36], the underlying Recommendation [#28] also noted that the First Amendment claim against Defendant Leday in his official capacity should be dismissed because it was redundant in light of the claim against Defendant WPS, a governmental entity. *Recommendation* [# 28] at 11.

amendment would be futile[.]" *Jones v. Norton*, 809 F.3d 564, 579 (10th Cir. 2015). "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal." *Bradley v. Val-Mejias*, 379 F.3d 892, 901 (10th Cir. 2004) (quoting *Jefferson Cnty. Sch. Dist. v. Moody's Investor's Servs.*, 175 F.3d 848, 859 (10th Cir. 1999)). In other words, to determine whether a proposed amendment is futile, a court must determine if it could survive a motion to dismiss. *Id.*

Fed. R. Civ. P. 12(b)(6) permits dismissal of a claim where the plaintiff has "fail[ed] to state a claim upon which relief can be granted." The Rule 12(b)(6) standard tests "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). However, conclusory allegations are not entitled to a presumption of truth. *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009). Rather, "[a] complaint must contain 'enough facts to state a claim to relief that is plausible on its face.'" *Santa Fe All. for Pub. Health & Safety v. City of Santa Fe*, 993 F.3d 802, 811 (10th Cir. 2021) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "When the complaint includes 'well-pleaded allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Carraway v. State Farm & Cas. Co.*, No. 22-1370, 2023 WL 5374393, at *4 (10th Cir. Aug. 22, 2023) (quoting *Iqbal*, 556 U.S. at 679).

### III. Analysis

Defendants argue that the Motion [#37] should be denied because the proposed amendments are futile. *Response* [#40] at 2-3. Therefore, the Court analyzes each claim to determine whether it satisfies the Rule 12(b)(6) standard, as follows: (1) the § 1983 claim asserting a violation of Plaintiffs' First Amendment freedom of speech rights; (2) the

first Title VII claim asserting a violation based on a failure to accommodate theory; (3) the second Title VII claim asserting a violation based on a constructive discharge theory; and (4) the CADA claim premised on religious discrimination (failure to accommodate) and constructive discharge.

## A.    First Amendment

For Plaintiffs to prove that they suffered an unconstitutional prior restraint on their speech, entitling them to relief under § 1983, they must show that the no-contact directive chilled their potential speech. *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1182 (10th Cir. 2010) ("*Brammer-Hoelter II*"). That chilling effect must have been because of a reasonable fear of consequences. *Id.* Moreover, Plaintiffs must allege more than a bare assertion that they were discouraged from speaking because of government action. *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). Rather, there must be sufficient allegations for the Court to determine that the chilled speech would have been on a matter of public concern. *Arndt v. Koby*, 309 F.3d 1247, 1252 (10th Cir. 2002); *Berger v. City and County of Denver*, No. 18-cv-01836-KLM, 2019 WL 2450955, at *6-*7 (D. Colo. June 11, 2019). "Matters of public concerns are 'those of interest to the community, whether for social, political, or other reasons.'" *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1205 (10th Cir. 2007) ("*Brammer-Hoelter I*") (quoting *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1224 (10th Cir. 2000)). Plaintiffs' § 1983 claim in the original Complaint [#1] was previously dismissed based on a failure to specify which matters of public concern Plaintiffs were chilled from discussing. *Order* [#36] at 7-8.

In their Proposed Amended Complaint [#37-1], Plaintiffs aver that they wanted to speak with family and friends who worked at Defendant WPS about topics such as Defendant WPS's handling of the COVID-19 vaccine, Defendant WPS's response to the COVID-19 pandemic, and Defendant WPS's treatment of its employees with sincerely held religious beliefs. *Proposed Am. Compl.* [#37-1] at 9, 11-14, 16, 18, 20, 22-27, 29-30. They allege that they refrained from doing so, however, due to the no-contact directive. *Id.* Defendants argue that these allegations do not sufficiently support a claim potentially entitled to relief. *Response* [#39] at 9-11. Specifically, Defendants argue that these allegations are conclusory because merely naming general topics does not give the Court sufficient information to determine whether the potential speech would have been on matters of public concern or on purely personal matters. *Id.* at 10-11. The Court disagrees.

Notably, speech can still be on a matter of public concern even if it also involves a plaintiff's personal interests. Speech is *not* of public concern, however, if it is "speech of *purely* personal interest[.]" *Arndt*, 309 F.3d at 1252 (emphasis added). Here, the allegations demonstrate that Plaintiffs' potential speech was on matters of personal interest—but not purely so. Defendant WPS's handling of the COVID-19 vaccine and response to the COVID-19 pandemic were also matters of public concern, because they are of great interest to the community. Defendants correctly note that courts generally want to ensure that the actual comments, rather than the subject matter as whole, are on a matter of public concern. *Wilson v. City of Littleton, Colo.*, 732 F.2d 765, 769 (10th Cir. 1984). However, this understandably cannot be satisfied in prior restraint cases where no actual comments have been made. Thus, the Tenth Circuit has been less demanding in such cases. *See Luethje v. Peavine Sch. Dist. of Adair Cnty.*, 872 F.2d 352, 355 (10th Cir.

1989)) (stating that "whether the board's policy was unconstitutional depends on whether it potentially stifled speech of public concern"). Therefore, the Court finds that Plaintiffs' allegations sufficiently state that their chilled speech would have been on matters of public concern.

Defendants also posit that the no-contact directive did not chill Plaintiffs' speech because Plaintiffs were still free to speak to members of the public about whatever they wanted. *Response* [#39] at 10. However, Plaintiffs do not have to show that their speech was entirely chilled; *some* restraint on their speech is sufficient. *See Brammer-Hoelter II*, 602 F.3d at 1183 ("[T]he record supports the conclusion that [the] directives, while not chilling [p]laintiffs' speech and association entirely, did cause [p]laintiffs to alter the exercise of their speech and association rights . . .. We conclude that these alterations in the place and manner of [p]laintiffs' speech and association are sufficient to show that [p]laintiffs were chilled in the exercise of their First Amendment rights by [the] directives.").

Additionally, Plaintiffs' allegations that their speech was chilled by the no-contact directive is based on an objectively reasonable fear of consequences. The directive explicitly states that "[f]ailure to adhere to this directive will lead to disciplinary actions up to an[d] including termination of employment." *Proposed Am. Compl.* [#37-1] at 6. Accordingly, Plaintiffs sufficiently allege that their potential speech on matters of public concern was chilled by the no-contact directive, and thus the Court finds that they adequately state a claim upon which relief can be granted.[7]

---

[7] The Court notes that the claim against Defendant Leday in his official capacity appears to be redundant in light of the claim against WPS, a governmental entity. *See Recommendation* [#28] at 11. However, because neither party raised this issue in connection with the Motion [#37], the Court does not address it here. *See generally Motion* [#37]; *Response* [#39]; *Reply* [#40]. However, if appropriate, this issue may be raised in a subsequent dispositive motion.

**B.**     **Title VII: Failure to Accommodate**

Title VII renders unlawful employment practices that "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). Religion "includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that [it] is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Therefore, an employer must "reasonably accommodate the individual's religious practices" unless it can demonstrate that undue hardship would result. 29 C.F.R. § 1605.2(c)(1).

For Plaintiffs to state a claim for relief under a failure to accommodate theory, they must adequately allege that (1) they had a bona fide religious belief that conflicted with an employment requirement; (2) they informed Defendant WPS of that belief; and (3) they suffered an adverse employment action for failing to comply with the employment requirement. *Christmon v. B&B Airparts, Inc.*, 735 F. App'x 510, 513 (10th Cir. 2018) (citing *Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1155 (10th Cir. 2000)); *see also Caspersen v. W. Union, LLC*, No. 23-cv-00923-NYW-SBP, 2023 WL 6602123, at *4 (D. Colo. Oct. 10, 2023) (noting that, per Tenth Circuit and Supreme Court precedent, "a 'failure to accommodate' claim does not exist as a freestanding claim under Title VII," but requires 'an adverse employment action,'—i.e., something *in addition to* the failure to accommodate") (quoting *Exby-Stolley v. Bd. of Cnty. Comm'rs*, 979 F.3d 784, 793 n.3 (10th Cir. 2020)); *Medina v. Safeway Inc.*, No. 20-cv-03726-NYW, 2022 WL 672488, at *7 (D. Colo. Mar. 7, 2022). Here, the second element is uncontested, i.e., that Plaintiffs

sufficiently allege that they informed Defendant WPS of their beliefs. *Proposed Am. Compl.* [#37-1] at 3. In the Response [#39], Defendants argue that Plaintiffs' claim fails on the first and third elements. *Response* [#39] at 3.

### 1.    Bona Fide Religious Belief

#### a.    Standard

Title VII provides a broad definition of religion, and "American courts are loath to tell a person that [her] interpretation of [her] faith is a wrong one." *Detwiler v. Mid-Columbia Med. Ctr.*, No. 22-cv-01306, 2023 WL 7221458, at *5 (D. Or. Sept. 13, 2023) (quoting *Hittle v. City of Stockton*, No. 12-cv-00766, 2022 WL 616722, at *5 (E.D. Cal. Mar. 2, 2022), *aff'd*, *Hittle v. City of Stockton*, 76 F.4th 877 (9th Cir. 2023)). However, courts need not "take plaintiffs' conclusory assertions of violations of their religious beliefs at face value." *Bolden-Hardge v. Off. of Cal. State Controller*, 63 F.4th 1215, 1223 (9th Cir. 2023); *see also Mason v. Gen. Brown Cent. Sch. Dist.*, 851 F.2d 47, 51 (2d Cir. 1988) (stating that "[a]n individual's assertion that the belief [is religious does not] automatically mean that the belief is religious. . .. [A] threshold inquiry into the religious aspect of particular beliefs and practices cannot be avoided if we are to determine what is in fact based on religious belief, and what is based on secular or scientific principles.") (internal quotation marks and citations omitted) (collecting cases). Thus, courts must engage in the sensitive task of analyzing the religiosity of a plaintiff's beliefs. *Wisconsin v. Yoder*, 406 U.S. 205, 215-216 (1972). In doing so, courts are not questioning the sincerity of plaintiffs' beliefs; rather, they are determining if plaintiffs pleaded sufficient non-conclusory facts to allow the court to determine whether their sincerely held beliefs

arose from a religious belief-system. *Caspersen v. W. Union, LLC*, No. 23-cv-00923-NYW-SBP, 2023 WL 6602123, at *5 (D. Colo. Oct. 10, 2023).

Notably, "beliefs that are effectively medical in nature" or beliefs based on moral commitments "are insufficient to state a religious belief for purposes of Title VII." *Aliano v. Twp. of Maplewood*, No. 22-cv-5598-ES-AME, 2023 WL 4398493, at *5 (D.N.J. July 7, 2023). Courts tend to be suspicious when personal judgment or medical concerns appear to be the true motivation behind the exemption request, even when religious language is used. *See, e.g.*, *Petermann v. Aspirus, Inc.*, No. 22-cv-332-JDP, 2023 WL 2662899, at *2 (W.D. Wis. Mar. 28, 2023) (stating that, if the plaintiff "believed that the vaccine defiled her body because it was unhealthy or unsafe, that would be a medical objection, not a religious objection. But if her objection to the vaccine was rooted in a belief 'that she must remain as God made her,' that would be sufficient to show a religious conflict at the pleading stage.") (internal citation omitted); *Passarella v. Aspirus, Inc.*, No. 22-cv-287-JDP (consolidated), 2023 WL 2455681, at *5-6 (W.D. Wis. Mar. 10, 2023) (dismissing the plaintiffs' Title VII claims arising from their refusals to take a vaccine, couched in religious terms such as a belief that their bodies are temples which they could not harm, because "the use of religious vocabulary does not elevate a personal medical judgment to a matter of protected religion").

Different courts have utilized different tests to assess the religiosity of beliefs at the motion to dismiss stage. In *Caspersen v. Western Union, LLC*, 2023 WL 6602123, the court, while mindful of the need to construe the allegations in the plaintiff's favor, adopted a test from the District of New Jersey, which considered: (1) whether the plaintiff's allegations provided the court adequate insight into the plaintiff's subjective beliefs; (2)

how those beliefs arose from the plaintiff's religious belief-system; and (3) how those beliefs formed the basis of the objection to a COVID-19 vaccination. *Caspersen*, 2023 WL 6602123, at *9 (citing *Aliano*, 2023 WL 4398493, at *8). This test emphasizes that "[c]onclusory allegations that a belief is religious are . . . insufficient; rather, a plaintiff must allege *how* . . . her objection arises from a subjective belief that is tied to her belief system[.]" *Id.* at *7 (citing *Aliano*, 2023 WL 4398493, at *5).

In *Aliano*, the court found that five of the plaintiffs sufficiently stated religious beliefs to survive motions to dismiss when they cited Bible verses forming the foundation of their beliefs and explained their interpretation of those Bible verses. *Aliano*, 2023 WL 4398493, at *6-*9. However, three claims were dismissed because the plaintiffs only stated that, based on their religion, they opposed abortion and, therefore, could not use vaccines which were developed using fetal cell lines. *Id.* at *10-*12. The court noted that those plaintiffs' bare references to Christianity and Catholicism and mere identification with organized religion failed to adequately relate their objections to religious beliefs. *Id.* at *11.

While the approach taken in *Aliano* and *Casperson* effectively navigates the pleading requirements of *Twombly* and *Iqbal*, the Court is compelled by approaches more recently taken in *Does 1-11 v. Board of Regents of University of Colorado*, 100 F.4th 1251 (10th Cir. 2024), and the persuasive authority of *Ringhofer v. Mayo Clinic, Ambulance*, 102 F.4th 894 (8th Cir. 2024).[8] These recent decisions suggest that the Tenth Circuit would not support the detailed analysis required by the *Aliano*/*Casperson* test.

---

[8] *See, e.g.*, *Hanks v. Anderson*, No. 2:19-cv-00999-DBB-DAO, 2023 WL 8936279, at *4 (D. Utah Dec. 27, 2023) (noting that out-of-circuit cases are not binding but may be used as persuasive authority).

Both *Does 1-11* and *Ringhofer* were issued post-*Casperson* and *Aliano*. *Does 1-11*, while not directly on point, is informative. There, employees and students at the University of Colorado's Anschutz Campus asserted violation of their First Amendment Free Exercise and Establishment Clause rights based on the University's policies regarding religious exemptions from its COVID-19 vaccine mandate. 100 F.4th at 1256-57. The Circuit held that some of the plaintiffs were entitled to a preliminary injunction in part because they had shown that their claims had a likelihood of success on the merits. *Id.* at 1256, 1269, 1279. In conducting its analysis, the Tenth Circuit noted that "[t]he 'intrusive religious inquiry' that the Administration conducted here is . . . flatly barred by the Establishment Clause" because "[s]uch an inquiry violates the Establishment Clause's 'prohibition of "excessive entanglement" between religion and government,' and is therefore 'unconstitutional without further inquiry.'" *Id.* at 1270 (quoting *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1261, 1267 (10th Cir. 2008)). The Tenth Circuit stated that the defendant could have asked "*whether* an applicant had a sincerely-held religious belief prohibiting her from receiving the COVID-19 vaccine," but instead impermissibly "asked *why* the applicant held her religious beliefs," before denying or granting "exemptions on a case-by-case basis." *Id.* at 1273. The Circuit warned that the defendants' "inquiries into the sincerity of the Does' religious beliefs were precisely the sort of 'trolling through a person's . . . religious beliefs' for which this Court and the Supreme Court have repeatedly admonished state actors." *Id.* at 1274 (citations omitted). In addressing the partial dissent's opinion, the majority concluded:

> [T]he [defendant] was entitled to ask applicants whether they opposed being vaccinated for religious reasons, rather than secular ones. But an employee could answer that question with little more than "yes" or "no." The why sought by the [defendant], and endorsed by the partial dissent,

transgressed all boundaries set by the Religion Clauses. The [defendant] was not entitled to demand a further explanation about the mechanics of employees' religious doctrines, or to ask employees to detail why their religious beliefs proscribe receipt of a COVID-19 vaccine, or to require employees to justify the differences between their past religious views on other vaccines and their current religious views on COVID-19 vaccines. But that is precisely what the [defendant] did. The partial dissent would permit such intrusive inquiries under the guise of "determin[ing] whether the applicant's religious belief underlying the exemption request was sincerely held."

*Id.* at 1281 (internal citation omitted).

In the published Eighth Circuit case of *Ringhofer*, the defendant's employees were required to receive the COVID-19 vaccine during the pandemic or have their employment terminated. 102 F.4th at 898. "The plaintiffs sought religious accommodations for the vaccination requirement, citing their Christian religious beliefs" because "(1) according to Scripture, their 'body is a temple' they must respect and protect, and (2) their anti-abortion beliefs, rooted in religion, prevent using a product 'produced with or tested with fetal cell lines.'" *Id.* The district court granted Rule 12(b)(6) dismissal and held that the plaintiffs "did not adequately plead that their religious beliefs conflicted with the vaccination or testing requirements," but the Eighth Circuit reversed, stating that "[t]he district court did not 'consider the complaint as a whole,' instead focusing on specific parts of the complaints to rule the anti-vaccine beliefs 'personal' or 'medical.'" *Id.* at 898, 901. The five *Ringhofer* plaintiffs had alleged, respectively:

(1) "[The first plaintiff's] religious beliefs prevent her from putting into her body the Covid-19 vaccines . . . because they were all produced with or tested with cells from aborted human babies. Receiving the vaccine would make her a participant in the abortion that killed the unborn baby."

(2) "[The second plaintiff's] religious exemption was based on opposition to the use of vaccines produced with or tested by aborted baby cells. [The second plaintiff] believes in the sanctity of life from conception until natural death. She lives her life according to her sincerely held religious beliefs. . .. She is Christian and has

determined she cannot, consistent with her conscience, take the Covid-19 vaccine, and to do so would make her complicit in the killing of the unborn babies from whom the cells used in the vaccines came."

(3) "[The third plaintiff's] body is a Temple to the Holy Spirit and is strongly against abortion. [The third plaintiff] believes the Vaccine Mandate violates his religious beliefs and conscience to take the Covid-19 vaccine because the vaccines were produced with or tested with fetal cell lines. [The third plaintiff] . . . [believes] that 'Using the fetal cells in the development of it, knowing about it, is against [his] religion.'"

(4) "Now the Holy Spirit dwells in [the fourth plaintiff] and she believes her body is a temple for the Holy Spirit that she is duty bound to honor. She does not believe in putting unnecessary vaccines or medications into her body, or going to the doctor or allowing testing of her body when it is not necessary. Accordingly, it violates her conscience to take the vaccine or to engage in weekly testing or sign a release of information that gives out her medical information."

(5) "[The fifth plaintiff's] faith is in [her] Creator who is [her] Healer (Ex 15:26). Faith is belief combined with action (Jam 2:17). Shifting [her] faith from [her] Creator to medicine is the equivalent of committing idolatry-holding medicine in greater esteem then Elohim (Col 3:5). [She] believe[s] it is legitimate to utilize modern medicine for life-saving purposes; however, there is a fine line between using it and abusing it . . . Excessive procedures, vanity surgeries, and redundant intrusive testing of healthy, asymptomatic humans is irresponsible and crosses the line violating [her] conscience before Elohim[.]"

*Id.* at 901-902. In reaching its conclusion, the Eighth Circuit noted the EEOC Guidance which states that "'overlap between a religious and political view does not place it outside the scope of Title VII's religious protections, as long as the view is part of a comprehensive religious belief system.'" *Id.* at 901 (quoting EEOC Compliance Manual § 12-I(A)(1) (Jan. 15, 2021)). The Eighth Circuit also emphasized that "beliefs do not have to be uniform across all members of a religion or 'acceptable, logical, consistent, or comprehensible to others.'" *Id.* at 902 (quoting *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981)).

While the Tenth Circuit's *Does 1-11* was on a different procedural footing (determining the likelihood of success on the merits of First Amendment Free Exercise

and Establishment Clause claims) than the present case (determining whether proposed pleading amendments of Title VII religious accommodation claims are futile in light of Rule 12(b)(6)'s "failure to state a claim" standard), *Does 1-11* emphasized that "a government employer such as the [defendant] must still provide religious accommodations under Title VII, and must abide by the First Amendment in doing so." 100 F.4th at 1280. A reading of *Does 1-11* together with the Eighth Circuit's *Ringhofer*—both recently issued in May 2024—counsels against delving too deeply into the religiosity of a plaintiff's beliefs in determining whether a plaintiff has stated a claim at this early stage of the case. Of course, conclusory allegations regarding the religiosity of beliefs will not pass muster, as the District Judge noted in her prior Order, *see* [#36] at 5-7, but they not need be detailed. *See Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 681. So long as they are "connecting their objection . . . to specific religious principles . . ., they have satisfied their burden at this stage." *Ringhofer*, 102 F.4th at 902.

### b.    Application

Two general categories of belief are at issue here. First, Plaintiffs Rainey, Wakely, Almada, Leivian, D. Laschinger, and Pierce assert that their religious opposition to abortion conflicted with the COVID-19 vaccine requirement. *Proposed Am. Compl.* [#37-1] at 8, 10, 12, 16, 20, 26. While the language of their stated religious beliefs is not identical, it is sufficiently similar to allow the Court to group them together. *Id.* For example, Plaintiff Almada alleges that, "[a]s part of [her] sincerely held religious beliefs, she believes that abortion is prohibited." *Id.* at 12.

Second, Plaintiffs Wakely, Lapp, Powell, Kreder, Olson, and A. Laschinger allege that they cannot take the COVID-19 vaccine because it violates God's will, because God

will protect them from illness, because their bodies are temples of the Lord, or because they must follow their own personal judgment. *Proposed Am. Compl.* [#37-1] at 10, 14, 18, 22-24, 28. Again, although these beliefs are not identical, they are similar enough for the Court to group them together. *Id.* For example, Plaintiff Lapp alleges that "[a]s a Christian, [she] believes that she is guided by God in her decision-making." *Id.* at 14.

### i.    Abortion Beliefs

While Plaintiffs Rainey, Wakely, Almada, Leivian, D. Laschinger, and Pierce have effectively provided insight into their belief that abortion is prohibited, their allegations regarding how that belief arose from their religious belief-system is more tenuous. *Id.* at 8, 10, 12, 16, 20, 26. The Proposed Amended Complaint [#37-1] alleges that they hold these beliefs as either Christians, Catholics, Pantheists, or Spiritualists. *Id.* Further, Plaintiff Leivian and Plaintiff Pierce explicitly state that their objections to the vaccine are moral. *Proposed Am. Compl.* [#37-1] at 16, 26. Plaintiff Leivian states that, "included in [her] sincerely held religious beliefs as a Catholic, is that there is a moral duty to refuse the use of medical products . . . that utilized abortion-derived cells." *Id.* at 16. Plaintiff Pierce states that, "[a]s a Catholic, [she] believes that abortion is morally unacceptable." *Id.* at 26.

Generally, mere identification with a religion, without more, is insufficient to show how the beliefs at issue arise from a religious belief-system. *See Caspersen*, 2023 WL 6602123, at *7 (citing Aliano, 2023 WL 4398493, at *5). Here, Plaintiffs have not fleshed out how their beliefs are connected to their religious belief-system, such as, by way of example only, by citing religious texts and providing their interpretation of those texts. *Caspersen*, 2023 WL 6602123, at *8; *Aliano*, 2023 WL 4398493, at *11. Some courts

have also held that "[b]eliefs that . . . amount to an 'isolated moral teaching' are insufficient to state a religious belief for purposes of Title VII." *Aliano*, 2023 WL 4398493, at *5 (citing *Fallon v. Mercy Cath. Med. Ctr. of. Se. Pa.*, 877 F.3d 487, 490 (3d Cir. 2017)).

The Court notes that Plaintiffs Rainey and Leivian have clearly alleged how their beliefs form the basis of their objections to the COVID-19 vaccine. They allege that, as a Christian and as a Catholic, they are forbidden from "being complicit in abortion in any way." *Proposed Am. Compl.* [#37-1] at 8, 16. Thus, because the COVID-19 vaccine was developed using fetal cell lines, they allege that taking the vaccine would make them complicit in abortion. *Id.* This puts Defendants on notice about how Plaintiffs Rainey's and Leivian's subjective beliefs form the basis of their objection to taking the COVID-19 vaccine.

Similarly, although slightly less straightforward, Plaintiff D. Laschinger also adequately alleges how her beliefs form the basis of her objection to the COVID-19 vaccine. She alleges that she "sincerely believes that humans were made in God's image and that the spark of divinity is placed by God in every human life at inception."[9] *Id.* at 20. Thus, she "cannot accept any products . . . derived . . . [from] aborted human fetal cells." *Id.* Reading the Proposed Amended Complaint [#37-1] in a light most favorable to her, Plaintiff D. Laschinger appears to allege that abortion destroys that spark of divinity, and that complicity in that destruction is forbidden, thus leading to a prohibition on any products derived from aborted fetal cells.

The allegations as to how the beliefs of Plaintiffs Wakely, Almada, and Pierce form the basis of their objections to the COVID-19 vaccine are somewhat murkier. For

---

[9] Based on context, Plaintiff D. Laschinger likely means "conception" rather than "inception."

instance, Plaintiff Wakely notes that her beliefs include the importance of family and growing the population of Christian believers and that those beliefs "cause her to oppose anything that causes the destruction of the family unit, including abortion." *Id.* at 10. Relatedly, "[b]ecause the COVID-19 vaccine development process involved aborted fetal cells, Plaintiff Wakely could not take the [vaccine]." *Id.*  Plaintiff Almada's sincerely held religious beliefs as a Pantheist cause her to believe that "abortion is prohibited" and, because "aborted fetal cells were used in testing and producing COVID-19 vaccines," those "religious beliefs prevented her from taking the vaccine." *Id*. at 12. And Plaintiff Pierce's sincerely held religious beliefs as a Roman Catholic cause her to "oppose[ ] abortion," which, in turn, renders her "[unable to] take the COVID-19 vaccine" because the "vaccine['s] development process involved aborted fetal cells[.]" *Id*. at 26.

Nevertheless, solely for purposes of the present Motion [#37], and in reading the Proposed Amended Complaint [#37-1] as a whole and in light of *Does 1-11* and *Ringhofer*, the Court finds that Plaintiffs have provided enough allegations regarding their bona fide religious beliefs to make them plausible at this early stage of the proceedings. In other words, they have provided enough information, if just barely, to plausibly allege a connection between their beliefs about abortion and their religious belief systems and how their beliefs form the basis of their objections.

### ii.    Other Beliefs

Each Plaintiff at most provides tenuous allegations regarding how her belief arises from her religious belief-system. *See Proposed Am. Compl.* [#37-1] at 10, 14, 18, 22-24,

28.[10] Each Plaintiff states that she holds her belief either as a Catholic, Christian, or Pantheist. Each Plaintiff, though, alleges at least one belief showing how it centers around following her personal judgement, or following her discernment of God's will, and how that belief forms the basis of an objection to taking the COVID-19 vaccine. However, many of the beliefs, based on the allegations provided, could be interpreted as largely secular. For example, Plaintiff Olson alleges that her "Catholic faith requires her to follow her own conscience and personal judgment." *Proposed Am. Compl.* [#37-1] at 24. At least one court has held that "the use of religious vocabulary does not elevate a personal medical judgment to a matter of protected religion." *Passarella v. Aspirus, Inc.*, 2023 WL 2455681, at *6 (W.D. Wis. Mar. 10, 2023). Moreover, from a policy perspective, the Court must be careful of beliefs which simply state that God grants a person the right to make their own choices, because finding that such beliefs were bona fide religious beliefs could amount to a "blanket privilege" and a "limitless excuse for avoiding all unwanted . . . obligations." *Finkbeiner v. Geisinger Clinic*, 623 F. Supp. 3d 458, 465 (M.D. Pa. 2022) (quoting *Africa v. Pennsylvania*, 662 F.2d 1025, 1030-31 (3d Cir. 1981)).

Nevertheless, solely for purposes of the present Motion [#37], and in reading the Proposed Amended Complaint [#37-1] as a whole and in light of *Does 1-11* and *Ringhofer*, the Court finds that Plaintiffs have provided enough allegations, regarding their bona fide religious beliefs to make them plausible at this early stage of the proceedings. In other words, they have provided enough information, if just barely, to plausibly allege a

---

[10] E.g., "that God did not want [Plaintiff Wakely] to co[n]form to the pattern of the world and get the COVID-19 vaccine"; that "Plaintiff Lapp believes that her body is a temple of the Lord"; that "Plaintiff Powell sincerely believed that taking the vaccine would violate God's will," etc.

connection between their beliefs and their religious belief systems and how their beliefs form the basis of their objections.[11]

### 2.    Adverse Employment Action

Next, the Court analyzes whether Plaintiffs adequately pleaded that they suffered an adverse employment action for failing to comply with the COVID-19 vaccine requirement. *See Exby-Stolley v. Bd. of Cnty. Comm'rs*, 979 F.3d 784, 793 n.3 (10th Cir. 2020); *Christmon v. B&B Airparts, Inc.*, 735 F. App'x 510, 513 (10th Cir. 2018). Defendants argue that unpaid leave does not constitute an adverse employment action. *Response* [#39] at 7-8. Indeed, the cases that Defendants cite generally support this proposition. *See id.* (citing *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 70-71 (1986) (holding that a requirement that the plaintiff take unpaid leave in order to observe religious holidays was a reasonable accommodation); *Christmon*, 735 F. App'x at 514 (holding that an accommodation that allowed an employee to avoid a religious conflict by not working Saturday shifts, which provided overtime, without an alternate opportunity for the employee to earn overtime, was reasonable); *Austgen v. Allied Barton Sec. Servs., L.L.C.*, 815 F. App'x 772, 775-76 (5th Cir. 2020) (holding that being placed on unpaid leave to temporarily accommodate a medical condition was not an adverse employment action for plaintiff's Americans with Disabilities Act claim)).

However, each of those cases is distinguishable from Plaintiffs' case because each involves a plaintiff seeking accommodation for temporary issues, such as a need to miss work to observe religious holidays. On the other hand, here, Plaintiffs allege that they

---

[11] The Court emphasizes that these findings regarding bona fide religious beliefs are made solely for purposes of the present Motion [#37] at this early stage of the proceedings. The Court makes no comment regarding whether these allegations alone, if supported by evidence, would be sufficient to survive a motion for summary judgment or to support a jury verdict.

were placed on unpaid leave, without benefits, for a period that would last at least half of the school year. *Proposed Am. Compl.* [#37-1] at 4-5. This distinguishing feature leads the Court to believe that long-term, unpaid leave could plausibly constitute an adverse employment action. *See Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 73 (2006) (stating that indefinite suspension without pay could reasonably be viewed as materially adverse and deeming reasonable a jury's conclusion that a 37-day suspension without pay was materially adverse).

The District Judge in *Henn v. Westminster Public Schools*, No. 23-cv-01310-DDD-KAS (D. Colo.), faced a similar question on a motion to dismiss by two plaintiffs who, like the instant Plaintiffs, were also employed as teachers by Defendant Westminster Public Schools in the fall of 2021 when they were required to get vaccinations in response to COVID-19. *See* [#34, in No. 23-cv-01310-DDD-KAS] at 1. The plaintiffs there were also placed on indefinite unpaid leave when they refused to be vaccinated based, in part, because of their religious beliefs. *Id.* at 1, 12. In a March 8, 2024 decision, the District Judge noted that, while "unpaid leave is [often] not an adverse employment action," that "makes sense in the typical scenario where a plaintiff seeks accommodations for discrete or temporary issues such as doctors' appointments or religious observances[.]" *Id.* at 12-13. However, he found that those types of cases involved "a difference of degree" from *Henn*, which involved allegations that the plaintiffs "were placed on unpaid leave, without benefits, for an *indefinite* period that was to last at least through the school year—over half a year." *Id.* (emphasis in original). He therefore found that such a long period of unpaid leave could, at the motion to dismiss phase, plausibly demonstrate an adverse employment action. *Id.*

In adopting the prior Recommendation [#28] on the Motion to Dismiss [#24] in this case on September 27, 2023, the District Judge noted that Plaintiffs had cited "no controlling authority supporting their argument that their placement on temporary unpaid leave" was the equivalent of termination and therefore an adverse employment action. *Order* [#36] at 4. The District Judge observed that "the allegations in the Complaint demonstrate that Plaintiffs were neither discharged, disciplined, nor rejected from being rehired; rather, they were placed on temporary unpaid leave pending changes in the State of Colorado's COVID-19 policies and reevaluation of district safety concerns and quarantine protocols, and were asked to return to work at the end of their leave." *Id.* at 5.

While Plaintiffs have added *some* new allegations, they are largely reiterations of the allegations in their original Complaint [#1]: Plaintiffs were left without benefits while placed on indefinite unpaid leave. *Proposed Am. Compl.* [#37-1] at 4-5. Considering *Henn*, the Court finds that being left without any benefits for a period lasting at least half a school year could plausibly constitute a significant change in benefits, even if the benefits were restored in full after the unpaid leave ended. *See Annett v. Univ. of Kan.*, 371 F.3d 1233, 1257 (10th Cir. 2004) (holding that "a significant change in employment status, such as . . . a decision causing a significant change in benefits" constitutes an adverse employment action) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Thus, the Court further finds that Plaintiffs' amended allegations regarding their unpaid leave are sufficient to allege an adverse employment action at this early stage of the case.

C.      **Title VII: Constructive Discharge**

For Plaintiffs to succeed in a constructive discharge claim, they must show that "working conditions [became] so intolerable that a reasonable person in [their] position would have felt compelled to resign[.]" *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004). In other words, Plaintiffs must show that they had a "*no other choice* but to quit." *Woodword v. City of Worland*, 977 F.2d 1392, 1401 (10th Cir. 1992) (quoting *Irving v. Dubuque Packing Co.*, 689 F.2d 170, 172 (10th Cir. 1982); *see also Green v. Brennan*, 578 U.S. 547, 554 (2016) (reasoning that a constructive-discharge claim "necessarily includes the employee's resignation"). Notably, "[t]he question is not whether working conditions at the facility were difficult or unpleasant." *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135 (10th Cir. 2004) (internal quotation and citation omitted). Rather, Plaintiffs must show that, at the time of their resignations, their choices regarding their employment relationships were not voluntary. *Id.*

When determining the voluntariness of a plaintiff's resignation, courts "consider the totality of the circumstances under an objective standard." *Yearous v. Niobrara Cnty. Mem'l Hosp.*, 128 F.3d 1351, 1356 (10th Cir. 1997). The employee's subjective views of the situation are not relevant. *Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1270 (10th Cir. 2004). "[A] perceived demotion or reassignment to a job with lower status or lower pay may, depending on the individual facts of the case, constitute aggravating factors that would justify [a] finding of constructive discharge." *Neri v. Bd. of Educ.*, 860 F. App'x 556, 567 (10th Cir. 2021) (quoting *James v. Sears, Roebuck & Co.*, 21 F.3d 989, 992 (10th Cir. 1994)).

Most constructive discharge claims are brought under a hostile environment theory. *See Suders*, 542 U.S at 143 (discussing hostile-environment constructive discharge claim); *PVNF*, 487 F.3d at 797-98; *Exum*, 389 F.3d at 1135-36 (discussing constructive discharge in context of intolerable working conditions). However, some courts have allowed indefinite suspension-based constructive discharge claims to survive motions to dismiss. *See*, *e.g.*, *Wilson v. Columbia Gas of Penn.*, 676 F. Supp. 3d 424, 438-441 (W.D. Pa. 2023) (denying motion to dismiss constructive discharge claim arising from the plaintiff's indefinite suspension without pay after the plaintiff failed a fitness for duty exam because "[i]f proven, this situation represented a 'drastic change in employment status' that can amount to a constructive discharge"); *Bright-Asante v. Saks & Co., Inc.*, 242 F. Supp. 3d 229, 242-244 (S.D.N.Y. 2017) (denying motion to dismiss constructive discharge claim arising from the plaintiff's indefinite suspension without pay during an employer's store theft investigation which lasted "for approximately ten months . . . with no indication that [the plaintiff] would ever be called back," even after criminal charges were dropped).

Here, all but three Plaintiffs in the instant case claim they resigned during the summer of 2022, when Defendant WPS was in the process of offering them new positions for the 2022-2023 school year. *Proposed Am. Compl.* [#37-1] at 11, 13, 15, 17, 21-22, 29. Thus, the Court first analyzes the claims of the three Plaintiffs who resigned prior to the summer of 2022 to determine if their amendments are futile. Next, the Court analyzes the claims of those Plaintiffs who resigned during the summer of 2022.

### 1.    Resignations Prior to the Summer of 2022

Plaintiffs Rainey, Powell, and Olson are the only plaintiffs who resigned prior to the summer of 2022. *Proposed Am. Compl.* [#37-1] at 9, 19, 25. The Court first analyzes Plaintiffs Rainey's and Powell's claims before discussing Plaintiff Olson's claim.

### a.    Plaintiffs Rainey and Powell

Plaintiffs Rainey and Powell both allege that they had no choice but to resign from Defendant WPS. *Proposed Am. Compl.* [#37-1] at 9, 19. Specifically, they claim they could not support themselves and their families due to their unpaid leave. *Id.* Plaintiff Rainey had a particularly acute need for health insurance because she was pregnant. *Id.* at 9. After months seeking employment, Plaintiffs Rainey and Powell both found other employment at Boulder Valley School District ("BVSD"). *Id.* at 9, 19. However, they both had to resign from WPS to move to their new positions at BVSD. *Id.* Because Plaintiffs Rainey and Powell both needed income to support themselves and their families and because they were unable to secure other satisfactory employment during their job search, the Court finds it plausible that Plaintiffs Rainey and Powell might have had no other reasonable choice but to resign their positions at WPS. Thus, their amendments are not futile.

### b.    Plaintiff Olson

While Plaintiff Olson does not specifically allege when she resigned, the language of the Proposed Amended Complaint suggests that she did so prior to the summer of 2022. *Proposed Am. Compl.* [#37-1] at 25. Plaintiff Olson alleges that she experienced a hostile environment with Defendant WPS after requesting religious accommodations. *Id.* However, Plaintiff Olson provides only one non-conclusory factual allegation to support

this assertion: the principal at her school informed her that she would not provide any reference or recommendation if Plaintiff Olson were placed on leave. *Id.* This does not come close to the standard Plaintiff Olson must satisfy to plausibly allege her workplace was so hostile as to leave her with no other choice but to quit. *See, e.g.*, *Suders*, 542 U.S. at 129 (holding that the plaintiff was not constructively discharged despite being subjected to constant sexual harassment in the workplace); *Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 981 (10th Cir. 2008) (stating that "some evidence of discriminatory animus in the workplace will not necessarily establish a constructive discharge claim"); *Unal v. Los Alamos Pub. Schs.*, No. 13-cv-00367-LAM/WPL, 2015 WL 13260396, at *1-*2 (D.N.M. Mar. 6, 2015) (holding that the plaintiff was not constructively discharged despite being subjected to constant racial harassment in the workplace). Thus, Plaintiff Olson's constructive discharge claim does not adequately allege that she had no other choice than to quit; therefore, Plaintiff Olson's claim is futile.

### 2. Resignations During the Summer of 2022

Plaintiffs Almada, Leivian, Wakely, Lapp, A. Laschinger, and D. Laschinger allege that they resigned during the summer of 2022. *Proposed Am. Compl.* [#37-1] at 11, 13, 15, 17, 21-22, 29. Each Plaintiff, except D. Laschinger, claims she resigned either after Defendant WPS offered her a new position for the 2022-2023 school year or around the time she was expecting to be offered a new position. *Id.* Notably, courts are disinclined to find constructive discharge simply because a plaintiff is reassigned to a somewhat less desirable position with slightly lower pay or different duties. *Kreimeyer v. Hercules Inc.*, 892 F. Supp. 1360, 1363 (D. Utah 1994) (collecting cases). However, the Tenth Circuit has acknowledged that "[a] perceived demotion or reassignment to a job with lower status

or lower pay may, depending upon the individual facts of the case, constitute aggravating factors that would justify finding of constructive discharge." *James*, 21 F.3d at 993 (citing *Cockrell v. Boise Cascade Corp.*, 781 F.2d 173, 177 (10th Cir. 1986)). However, no constructive discharge exists when a plaintiff was going to be reassigned to a new position but resigned before receiving complete details of that new position. *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1222 (10th Cir. 2002). The Court analyzes each Plaintiff's claims to determine whether they are futile, grouping together certain Plaintiffs as appropriate.

### a.    Plaintiff Almada

Plaintiff Almada was given the option to return to Defendant WPS for the 2022-2023 school year as a preschool paraprofessional—even though Defendant WPS had librarian/media specialist positions available which were comparable to her past position. *Proposed Am. Compl.* [#37-1] at 13. Further, Plaintiff Almada was offered a community liaison position that was later revoked without explanation. *Id.* However, Plaintiff Almada fails to allege any details regarding the preschool paraprofessional position and how it differed from her past position. *Id.* Therefore, the amendment is futile because it contains no allegations regarding whether the preschool paraprofessional position constituted a perceived demotion with significantly lower status or pay.

### b.    Plaintiff Leivian

Plaintiff Leivian was a classroom teacher for over 28 years. *Proposed Am. Compl.* [#37-1] at 17. However, Defendant WPS did not offer her a classroom teaching job for the 2022-2023 school year. *Id.* Plaintiff Leivian fails to allege what position she was offered for the 2022-2023 school year, other than to baldly assert it was non-comparable. *Id.*

Because the amendment lacks non-conclusory allegations, Plaintiff Leivian fails to allege a plausible constructive discharge claim. Therefore, the amendment is futile.

### c.   Plaintiffs Wakely and Lapp

Plaintiffs Wakely and Lapp both resigned in the summer of 2022 before they were told in which positions Defendant WPS would place them. *Proposed Am. Compl.* [#37-1] at 11, 15. However, Plaintiffs Wakely and Lapp fail to allege any reason to believe they would not be offered a position for the 2022-2023 school year. *Id.* Rather, Plaintiffs Wakely and Lapp simply allege that they were not offered a satisfactorily comparable position—but they make this allegation even though they resigned before Defendant WPS could offer them positions for the 2022-2023 school year. *Id.* Further, as mentioned above, the Tenth Circuit found no constructive discharge in an analogous fact pattern where the plaintiff resigned before receiving complete details as to what position he would have been reassigned. *Garrett*, 305 F.3d at 1222. Thus, Plaintiffs Wakely and Lapp's amendments are futile.

### d.   Plaintiff A. Laschinger

Plaintiff A. Laschinger alleges that she had no choice but to resign after being offered a position in a different building. *Proposed Am. Compl.* [#37-1] at 29. Notably, Plaintiff A. Laschinger fails to allege that this position constituted a decrease in status or pay. *Id.* A mere move to another building, by itself, would not leave Plaintiff A. Laschinger with no other reasonable choice but to quit. *See Unal*, 2015 WL 13260396, at *10 (holding that the plaintiff was not constructively discharged when the defendant offered her a job at another school). Thus, Plaintiff A. Laschinger's amended constructive discharge claim is futile.

### e.    Plaintiff D. Laschinger

Unlike the other Plaintiffs who resigned during the summer of 2022, Plaintiff D. Laschinger does not assert any allegations regarding a position for the 2022-2023 school year. *Proposed Am. Compl.* [#37-1] at 21-22. Rather, Plaintiff D. Laschinger alleges that Defendant WPS failed to reassure her that she would not be subjected to retaliation for her sincerely held religious beliefs. *Id.* This fails to meet the high bar for claiming that an employer's hostile actions were so severe and pervasive as to leave her with no choice but to resign. Defendant WPS's purported "refus[al] to provide reassurances" is not equivalent to retaliatory conduct. Thus, Plaintiff D. Laschinger's constructive discharge claim is futile.

### 3.    Conclusion

Based on the foregoing, the Court finds that Plaintiffs Rainey and Powell have pleaded constructive discharge claims which are sufficiently plausible to survive a motion to dismiss. Conversely, Plaintiffs Olson, Almada, Leivian, Wakely, Lapp, A. Laschinger, and D. Laschinger did not adequately plead constructive discharge claims and their proposed amendments are futile.

### D.    Colorado Anti-Discrimination Act

No party raised any issues relating to the CADA claim in connection with the *Motion* [#37]. However, the substantive analysis for CADA is identical to claims made under Title VII. *See Agassounon v. Jeppesen Sanderson, Inc.*, 688 F. App'x 507, 509 (10th Cir. 2017) ("CADA discrimination . . . claims are subject to the same legal standards as Title VII claims.") (citing *Johnson v. Weld County*, 594 F.3d 1202, 1219 n.11 (10th Cir. 2010)); *Medina v. Safeway Inc.*, No. 20-cv-03726-NYW, 2022 WL 672488, at *6 (D. Colo. Mar. 7,

2022) (finding that the Title VII and CADA religious discrimination claims should be analyzed in tandem); *Barrington v. United Airlines*, 566 F. Supp. 3d. 1102, 1107 n.2 (D. Colo. 2021). Given this clear legal authority and the Court's Title VII analysis above, the Court finds that Plaintiffs' CADA claim is futile except as to Plaintiffs' claim regarding religious discrimination (failure to accommodate) and Plaintiffs Rainey and Powell's constructive discharge claim.

## IV. Conclusion

Based on the foregoing,

IT IS HEREBY **RECOMMENDED** that the Motion [#37] be **GRANTED in part and DENIED in part**.[12]

IT IS FURTHER **ORDERED** that any party may file objections **within 14 days** of service of this Recommendation. In relevant part, Fed. R. Civ. P. 72(b)(2) provides that, "within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. 2121 E. 30th St.*, 73 F.3d 1057, 1060 (10th Cir. 1996). The objection must be "sufficiently specific to focus the district court's attention on the factual and legal issues that are truly in dispute." *Id.* "[A]

---

[12] Should this Recommendation be adopted in full, the following claims will remain: (1) Claim One: First Amendment freedom of speech claim; (2) Claim Two: Title VII religious discrimination claim; (3) Claim Three: Title VII constructive discharge claim as to Plaintiffs Rainey and Powell only; and (4) Claim Four: CADA religious discrimination claim as to all Plaintiffs and constructive discharge claim as to Plaintiffs Rainey and Powell only.

party who fails to make a timely objection to the magistrate judge's findings and recommendations waives appellate review of both factual and legal questions." *Morales-Fernandez v. I.N.S.*, 418 F.3d 1116, 1119 (10th Cir. 2005).

Dated: July 7, 2024                    BY THE COURT:

Kathryn A. Starnella
United States Magistrate Judge